# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2777

_____

| | | |
|---|---|---|
| Myrle B. Cooper, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| St. Cloud State University, a Minnesota | * | |
| State University, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: June 16, 2000
Filed: September 25, 2000

_____

Before MUPRHY, HEANEY and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

This appeal requires us to decide when the statute of limitations began to run on a Title VII discrimination action brought by a college professor who was denied tenure. For reasons to be discussed, we hold that the statute of limitations began to run when the college announced its official tenure decision, rather than at the time of termination, and, thus, affirm the decision of the district court[1] dismissing plaintiff's Title VII claim

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

as time-barred.

## I.  BACKGROUND

In 1986, Saint Cloud State University (SCSU) hired Myrle Cooper as a full-time faculty member in its Art Department.  The announcement for Cooper's position stated: "M.F.A. [Master of Fine Arts]  and experience preferred.  M.A. [Master of Arts] with a record of successful professional activity and fundamental interest in teaching and previous teaching experience will be considered."  At the time he was hired, Cooper held a Bachelor of Fine Arts degree, a Master of Science degree in Adult Vocational Education, a Master of Science degree in Media Technology, and an Educational Specialist degree in Industrial Education and Technology.  Cooper indicated on his application form that he was enrolled in a doctoral program and that he intended to pursue an M.F.A. after he completed his Doctor of Philosophy degree (Ph.D.).  The faculty appointment form issued by SCSU and signed by Cooper in July of 1986 expressly stated that "consideration for tenure is contingent upon completion of Doctorate."

SCSU faculty are reviewed for tenure during their fifth year of employment. Thus, Cooper's tenure year was the 1990-1991 academic year.  If tenure is not granted during the tenure year, the faculty member is retained for one more academic year and then automatically terminated.  Although SCSU granted Cooper two paid leaves to work on his Ph.D., Cooper failed to complete his Ph.D. by the end of his tenure year. In April 1991, the faculty committee recommended to deny tenure because Cooper had not completed his Ph.D.  However, Cooper was told that the denial would be automatically rescinded if he finished his Ph.D. during the next academic year.

In 1992, Cooper and SCSU entered into a grievance settlement with respect to the tenure issue.  Under the terms of the settlement, Cooper had until May 1, 1995, to complete his Ph.D.  If Cooper completed his Ph.D. at any time prior to that date, tenure

would automatically be granted. SCSU ultimately extended the final deadline by one year because Cooper's dissertation chair had died and Cooper had to find a replacement. However, despite being provided two paid leaves of absence and an additional five years after his tenure year to complete his Ph.D., Cooper failed to do so within the prescribed time-period and was automatically terminated from his position in the Art Department.[2]

Following his termination, on January 13, 1997, Cooper filed a complaint with the Equal Employment Opportunity Commission (EEOC). Cooper subsequently filed suit in federal district court alleging claims under Title VII and the Minnesota Human Rights Act (MHRA) for racial discrimination, racial harassment, and reprisal. SCSU moved for summary judgment, arguing that 1) Cooper's Title VII claim was time-barred and 2) the Eleventh Amendment bars Cooper's MHRA claim. The district court granted SCSU's motion for summary judgment.

## II.  ANALYSIS

### A.  Title VII Claim: Denial of Tenure

The threshold question we must answer is whether Cooper filed his complaint with the EEOC within the applicable statute of limitations period. Title VII provides that a charge of discrimination must be filed within three hundred days after the alleged unlawful employment practice occurred. See 42 U.S.C. § 2000e-5(e). Cooper's Title VII claim arises from SCSU's decision to deny Cooper tenure and to terminate his

---

[2]Cooper was actually terminated from his faculty position and offered a staff position, which was created especially for him. Cooper accepted the staff position of "Special Assistant," providing SCSU students with computer support in the Learning Resources Services area and providing graphic support for campus publications. Cooper took early retirement in November 1998.

employment because he failed to obtain a Ph.D. within the time period set forth in the 1992 settlement agreement. SCSU argues that Cooper's Title VII claim is time-barred because the statute of limitations began to run when Cooper learned of SCSU's decision in 1992. Cooper argues that the limitations period began to run no earlier than when SCSU actually terminated his employment in 1996 and assigned him to a "dummy position" in the Learning Resources Services area. In order to resolve this issue, we must first identify the discriminatory conduct underlying Cooper's claim.

The Supreme Court has recognized a distinction between the present effects of a past discriminatory act and present continuing discrimination. Compare Bazemore v. Friday, 478 U.S. 385 (1986) (holding that perpetuation of salary discrepancies based on race were actionable under Title VII, regardless of the fact that the discriminatory practice began prior to Title VII's effective date), with Delaware State College v. Ricks, 449 U.S. 250 (1980) (holding that the limitations period was triggered at the moment the college allegedly denied plaintiff tenure for a discriminatory reason, rather than a year later when he ultimately lost his job). Cooper argues that because SCSU granted tenure to seventeen white faculty members who lacked Ph.Ds during the time it was withholding tenure from Cooper, the statute of limitations issue should be analyzed as a continuing violations case. In essence, Cooper argues that SCSU committed a wrongful act of discrimination each time it granted tenure to a white faculty member who did not possess a Ph.D. SCSU maintains, however, that the uncontroverted evidence shows these other faculty members were not similarly situated to Cooper, and, thus, Cooper's appeal should be resolved under Ricks, a case involving one wrongful past act with continuing effects in the present.

In Ricks, the Supreme Court held that Title VII's limitations period began to run when the plaintiff, a college professor, was notified that he was denied tenure and would be offered a one-year terminal contract, rather than when the terminal contract expired a year later. See id. at 259. The Supreme Court reasoned that the only alleged discrimination occurred at the time the tenure decision was made and communicated

to the college professor, "even though one of the effects of the denial of tenure– the eventual loss of a teaching position– did not occur until later." Id. at 258 (emphasis in original) (internal quotation omitted). The Court explained that in order for the limitations period to commence with the date of the terminal contract:

> Ricks would have had to allege and prove that the manner in which his employment was terminated [via the terminal contract] differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants.

Id. at 258.

SCSU notified Cooper in 1992 that he would not receive tenure and would automatically be terminated from the Art Department unless he obtained his Ph.D. before May 1, 1995.[3] As in Ricks, the 1996 denial of tenure and termination were automatic effects of SCSU's 1992 decision to require Cooper to obtain a Ph.D. before he could receive tenure. Moreover, as in Ricks, Cooper was "abundantly forewarned" of the consequences of not obtaining his Ph.D. within the next three years. See id. at 262 n.16. Thus, unless Cooper can identify a discriminatory act that occurred after SCSU's 1992 tenure decision, the limitations period began to run when SCSU notified him of its official tenure decision in 1992. See id. at 258. Cooper failed to meet this burden.

Cooper first argues that SCSU committed wrongful acts of discrimination by granting tenure to other white faculty members who lacked Ph.Ds during the time it was denying him tenure. However, Cooper fails to identify any Art Department faculty

---

[3]As previously mentioned, SCSU extended this deadline by one year because Cooper's dissertation chair passed away.

-5-

member who was granted tenure without holding a terminal degree between 1992 and 1996. Rather, Cooper identifies seventeen white faculty members who were granted tenure in other departments at SCSU. Nothing in the record suggests, however, that these faculty members were similarly situated to Cooper. According to the undisputed evidence, market considerations of supply and demand explain why tenure requirements differ between some of SCSU's departments. Because colleges have difficulty recruiting computer science professors and librarians who hold Ph.Ds, SCSU maintains "professional" and "academic" tenure tracks within its Computer Sciences and Learning Resources Departments. The fact that SCSU granted tenure to professors in these departments even though they lacked Ph.Ds does not even begin to suggest that SCSU acted in a discriminatory manner by requiring members of its Art Department to hold Ph.Ds before gaining tenure. Thus, SCSU's decision to grant seventeen white faculty members tenure does not provide any basis for finding SCSU discriminated against Cooper in denying his tenure application.

Cooper next suggests that SCSU's decision to replace him with individuals who lacked Ph.Ds demonstrates that he was discriminated against because of his race. We reject this argument. The requirements for being hired at SCSU are not identical to obtaining tenure at SCSU. The vast majority of college and university professors are hired without having obtained the qualifications necessary for tenure; it is understood that they will meet those qualifications within a certain number of years prior to tenure review. If the professors do not meet the required qualifications by the time they come up for review, tenure is denied and they are terminated. The mere fact that SCSU hired two individuals who lacked Ph.Ds does not support a finding of discrimination because hiring decisions are different than tenure decisions.

Cooper finally argues that SCSU terminated his employment in a discriminatory manner. After Cooper's denial of tenure became final in 1996, Cooper requested a

transfer to the Mass Communications Department.[4] Cooper alleges that SCSU granted such a transfer to Professor Rudolf, a member of the Business Department who had been denied tenure in his original department. However, nothing in the record indicates that Cooper was similarly situated to Rudolf. Most significantly, the record does not indicate an actual opening or an existing need for someone with Cooper's abilities in the Mass Communications Department. In short, even assuming, arguendo, that SCSU transferred Rudolf to the Mass Communications Department, there is nothing in the record to support a finding that Rudolf and Cooper were similarly situated or treated in a discriminatorily different manner. Rather, the record merely shows an isolated incident that most likely occurred under unique circumstances at SCSU. SCSU had no obligation to create a position in its Mass Communications Department to avoid Title VII liability.

In sum, because Cooper failed to identify any discriminatory conduct that occurred after the 1992 settlement, we hold that the statute of limitations began to run when SCSU announced its official tenure decision, rather than at the time of termination, and, thus, affirm the decision of the district court dismissing plaintiff's Title VII claim as time-barred.[5] Cooper failed to present any evidence that SCSU acted in a discriminatory manner after it informed him of its tenure decision in 1992. Under the 1992 settlement agreement, Cooper's 1996 termination was the inevitable effect of Cooper not obtaining his Ph.D.

---

[4]Because the Mass Communications Department's accreditation depended on maintaining both "academic" and "professional" faculty, there were positions in that department for which tenure was available without a terminal degree.

[5]Having carefully reviewed the record and the parties' briefs, we conclude dismissal was proper with respect to Cooper's reprisal and hostile environment claims and affirm for the reasons stated by the district court. See 8th Cir. R. 47B.

## B. MHRA

SCSU asserts that the Eleventh Amendment bars federal-court jurisdiction over Cooper's state law claim under the MHRA. The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984). This constitutional bar applies with equal force to pendent state law claims. See Pennhurst, 465 U.S. at 120-21. We have previously recognized that the University of Minnesota is an instrumentality of the state which enjoys the state's Eleventh Amendment protections. See Trevelen v. University of Minnesota, 73 F.3d 816, 818 (8th Cir. 1996). SCSU argues that it also shares the state's Eleventh Amendment immunity because it is an agency of the State government under Minnesota Statute § 144. The district court agreed with SCSU. Cooper does not challenge this argument, but rather argues that Minnesota waived SCSU's Eleventh Amendment immunity by subjecting SCSU to potential liability under the MHRA. Thus, for purposes of this opinion, we assume that SCSU would be entitled to the protection of the Eleventh Amendment unless the state of Minnesota waived its immunity from suit in federal court.

"The test for determining whether a State has waived its immunity from federal court jurisdiction is a stringent one." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985). A State "is deemed to have waived its immunity only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." Id. at 239-40. "The interests of Federalism require that such a waiver be clear and unequivocal." Burk v. Beene, 948 F.2d 489, 493 (8th Cir. 1991). Importantly, "[a] State's general waiver of sovereign immunity is insufficient to waive Eleventh Amendment immunity; the state must specify an intent to subject itself to federal court jurisdiction." Santee Sioux Tribe of Neb. v. Nebraska, 121 F.3d 427, 431 (8th Cir. 1997) (emphasis added). In this case, Cooper has failed to argue, much less demonstrate, that the State of Minnesota has waived its

Eleventh Amendment immunity to suit in <u>federal court</u>.  Rather, Cooper only argues that Minnesota waived SCSU's immunity from suit by including it within the definition of "persons" liable to suit under the MHRA.  However, a careful reading of the statute reveals that Minnesota only consented to suit in its own state courts.  Under controlling Eighth Circuit precedent, the fact that Minnesota waived its immunity to suit in Minnesota's state courts is simply insufficient to waive its Eleventh Amendment immunity. <u>See</u> <u>id.</u>

### III.  CONCLUSION

For the reasons discussed, we affirm the district court's opinion dismissing plaintiff's claims in its entirety.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.