# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1478

_____

| | |
|---|---|
| Sam Duty, | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Arkansas |
| Norton-Alcoa Proppants, | * |
| | * |
| Appellant. | * |

_____

Submitted:  November 16, 2001

Filed:  June 18, 2002 (Corrected: 06/20/02)

_____

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
        NANGLE,[1] District Judge.

_____

McMILLIAN, Circuit Judge.

Norton-Alcoa Proppants ("NAP") appeals from a final order entered in United
States District Court[2] denying its motion for judgment as a matter of law or for a new
trial, amendment of the judgment, or remittur following a jury award of $305,000.00

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern
District of Missouri, sitting by designation.

[2]The Honorable Jimm Larry Hendren, United States District Judge for the
Western District of Arkansas.

in favor of its former employee Sam Duty for compensatory and liquidated damages arising from violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and punitive damages arising from violations of the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-101 *et seq*. Duty v. Norton-Alcoa Proppants, No. 99-2097 (W.D. Ark. Jan. 19, 2001) (memorandum opinion and order). For reversal, NAP argues that (1) the district court erred in finding a sufficient evidentiary basis to support the jury verdict, (2) the district court abused its discretion in refusing to admit evidence, (3) the district court erred in failing to remit the compensatory and punitive damages awards, and (4) the district court abused its discretion in awarding liquidated damages. For the reasons discussed below, we affirm the judgment of the district court.

## Jurisdiction

Jurisdiction in the district court was proper based upon 28 U.S.C. §§ 1331, 1367, and 29 U.S.C. §§ 2601-2654. Jurisdiction in this court is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

## Background

Duty began working for NAP in 1979 and over the years performed several jobs, most recently that of a mechanic and welder ("maintenance mechanic"). The job required heavy work and heavy lifting. The NAP plant is multi-leveled, requiring workers to climb stairs and ladders to reach five to six levels, up to 100 feet above the ground.

In addition to his NAP job, Duty also worked on his 77-acre farm. At the time of trial, Duty worked between forty and sixty hours a week on his farm, engaging in

general farm labor including feeding cattle, baling hay, driving a dump truck, driving a tractor, hauling dirt, and working on farm machinery.

In 1981, Duty suffered a work-related injury at NAP, which resulted in episodes of neck pain and numbness in his hands. During one episode in April 1997, Duty consulted Dr. Charles Chalfant, who wrote a note to excuse Duty from work for three weeks. As a policy, NAP provides its employees with twenty-six weeks of short-term medical leave and disability pay. Pursuant to Dr. Chalfant's note, Davine White, NAP's Human Resources Coordinator, processed a short-term disability claim for Duty. As part of this process, Duty authorized White to contact his medical care providers on an ongoing basis to obtain the information necessary to process his weekly disability income checks during the period of his short-term disability benefits. These benefits continued from April to October 1997.

As part of its personnel policies, NAP requires employees desiring to return to work following a sick leave to present a physician's fitness-for-duty certificate showing that the employee is able to perform his or her essential job functions. NAP refuses to return an employee to his or her former position if the doctor imposes work restrictions that prevent an employee from safely performing those essential job functions.

In July 1997, during Duty's medical leave, NAP revised its handbook to include the fitness-for-duty certification policy pursuant to instructions from the United States Department of Labor. The handbook states:

> All employees must submit a written certification from a medical provider that the employee is capable of performing their duty prior to returning to work. No employee will be permitted to return to work without a "fitness for duty" certification.

Although NAP claims to have mailed Duty a copy of the revisions on or about July 1, 1997, Duty claims to have no memory of receiving it. In addition, NAP instituted a "no rehire" policy in 1997, which precludes NAP from rehiring former employees.

Since 1993, when the FMLA went into effect, NAP has required employees to use available paid vacation leave during their FMLA leave. In April 1997, when Duty's FMLA leave began, NAP applied his accrued vacation benefits to his FMLA leave and issued him a check for vacation pay.

On May 16, 1997, Dr. Chalfant referred Duty to Dr. Joseph Queeney and signed a form stating that Duty could return to work after release from Dr. Queeney. Dr. Queeney diagnosed Duty with degenerative disc disease. However, Duty did not obtain a release from Dr. Queeney. On May 22, 1997, Duty visited Dr. Chalfant and discussed job-related stress. Dr. Chalfant did not give Duty a fitness-for-duty certificate, but told Duty to go back to work and attempt to do his job. When Dr. Chalfant stopped working with NAP's HMO, Dr. Mohsen Keyashian became Duty's primary physician. On June 5, 1997, Duty informed Dr. Keyashian he was experiencing neck pain and numbness in his hands and arms. Duty also told him that Dr. Chalfant had prevented him from working since April 1997. On June 27, 1997, Dr. Keyashian reported that Duty "can restart limited work if he tolerates it and I gave him a statement. If he cannot tolerate work or it brings any trouble, he will call me." Duty testified that he had submitted Dr. Keyashian's statement to White, telling her he wanted to return to work, and that White informed him that NAP had no limited work available.

On July 28, 1997, Duty again visited Dr. Keyashian, complaining of increased neck pain and numbness in his fingertips. At this visit, Duty inquired about disability benefits, and Dr. Keyashian explained that NAP and its insurance company would assign another physician for disability evaluation. Dr. Keyashian sent a physician's statement form to White on July 28, 1997, stating that Duty was able to return to

"limited work." White called Dr. Keyashian's office to clarify what "limited work" entailed, and Dr. Keyashian told her it meant "no lifting, no climbing, or no standing for long periods of time."

On September 15, 1997, NAP mailed a certified letter to Duty informing him that his medical leave qualified under the FMLA. The letter instructed him that:

> You will be required to present a physician's release certificate in order to be restored to employment.
>
> If you return to work within 12 weeks from the date of receipt of this letter, you will have the right to the same or an equivalent job. However, if you fail to return to work within 12 weeks from the date of receipt of this letter, this right will no longer exist.

NAP attached to the letter a copy of WH Publication 1420, "Your Rights under the Family and Medical Leave Act of 1993." Duty received NAP's September 15 letter on September 18, 1997. At trial he testified that he read part of the letter and that he was not familiar with the FMLA.

In mid-October 1997, Duty's short-term disability benefits ceased. As a result, White discontinued contacting Duty's medical care providers because she no longer needed the information to write Duty's weekly disability checks.

On October 31, 1997, Duty met with Dr. Queeney, complained of upper extremity pain, and asked for permanent disability status. On November 20, 1997, Duty visited Dr. Keyashian, telling him that he could not perform heavy lifting or heavy work, and that NAP had no light job for him to do. Dr. Keyashian explained that Duty was not totally disabled but should not do heavy work and wrote a statement to that effect. Duty testified that at this time, he thought he could do anything except heavy lifting.

On December 11, 1997, Duty telephoned White to ask what he needed to do to return to work. White informed him that as far as she was concerned, his twelve weeks of FMLA leave had elapsed and his employment was terminated. Duty testified that he did not think White had the authority to fire him. According to NAP, White does not have the authority to hire NAP employees or fire them for performance reasons, but may administratively terminate employees who fail to return to work from sick leave without consulting management.

In a letter dated December 19, 1997, and signed by White's supervisor, NAP informed Duty that his failure to return to work upon completion of twelve weeks of FMLA leave resulted in his voluntary termination. Upon receipt of the letter, Duty instructed his wife to write a response, dated January 8, 1998, which asked: "Is it possible that you could make a position for me with my limitations[?]". On January 28, 1998, Duty's wife wrote a second letter, which again inquired about creating a position for him with his limitations, because his limitations had resulted from a job-related injury. On February 3, 1998, White responded to Duty's letters with a letter stating that his FMLA entitlement had been exhausted on December 11, 1997, and that his failure to comply with the FMLA regulations to keep NAP informed of his condition and to present a return-to-work certification was considered a voluntary termination. Duty testified that this was the first notice he received of his termination.

After his termination, Duty worked on his farm and did not try to find outside employment. Dr. Keyashian completed a long-term disability attending physician's statement form, which limited Duty's work to "no heavy duty work, including lifting."

On July 2, 1998, Duty filed a charge of discrimination against NAP with the Equal Employment Opportunity Commission ("EEOC"), claiming that NAP discriminated against him based on disability. The EEOC issued a right-to-sue letter.

On June 15, 1999, Duty filed suit in federal district court against NAP under the FMLA and the ACRA, claiming that (1) NAP failed to provide him medical leave as required by the FMLA and (2) terminated his employment, based on disability, in violation of the ACRA. NAP moved to dismiss the ACRA claim, arguing that it was time-barred. NAP also moved for summary judgment, asserting that Duty (1) was not a qualified individual with a disability under the ACRA and (2) had no right to job restoration pursuant to the FMLA. The district court denied both motions, and the matter went to trial.

At trial, Duty testified that he experienced symptoms of chilling occurring several times a week and lasting approximately forty-five minutes, chronic neck pain approximately ninety percent of the time, weakness, numbness in his groin and hands, upper arm pain, and headaches. Duty further testified that numerous lifting devices were available for use by maintenance mechanics, that his physical problems had not changed since 1981 and that he had performed the essential functions of his job since that time. Harold Pemberton, another NAP maintenance mechanic, testified that Duty could perform the essential functions of his job. Dale Thomas, a vocational consultant, submitted an affidavit stating that although there were 6,780 jobs in the area requiring the same type of training, knowledge, skills, and abilities as Duty's NAP position, all of those jobs required heavy lifting and therefore Duty was disqualified from those positions on the basis of his disability.

At the close of Duty's evidence at trial, and again at the close of NAP's evidence at trial, NAP moved for judgment as a matter of law. The district court denied both motions. The jury returned a verdict in the amount of $305,000.00 in Duty's favor, which included (1) back pay and liquidated damages pursuant to the FMLA, and (2) punitive damages pursuant to the ACRA. The district court entered judgment and NAP filed a renewed motion for judgment as a matter of law or for a new trial, amendment of the judgment, or remittur. On January 19, 2001, the district

court denied NAP's post-trial motions, and awarded Duty attorney's fees and costs totaling $54,673.05. This appeal followed.

**Discussion**

## I. Denial of Motion for Judgment as a Matter of Law

We review the denial of a motion for judgment as a matter of law *de novo*, applying the same standard as the district court, to determine whether sufficient evidence existed to support the jury's verdict. See Douglas County Bank & Trust Co. v. United Financial Inc., 207 F.3d 473, 477 (8th Cir. 2000). The non-moving party is entitled to the benefit of all reasonable inferences, and a reasonable inference is one that may be drawn from the evidence without resort to speculation. See Kinserlow v. CMI Corp., 217 F.3d 1021, 1026 (8th Cir. 2000). We disregard all evidence favorable to the moving party that the jury is not required to believe. See id. at 1025.

NAP argues that there was insufficient evidence to support the jury's verdict concerning Duty's ACRA and FMLA claims. For the reasons stated below, we disagree.

A. ACRA Claim

NAP contends that the district court erred in denying its motion for judgment as a matter of law on Duty's ACRA claim because: (1) the EEOC administrative charge predicating Duty's claim was untimely filed, rendering his ACRA claim time-barred, (2) Duty failed to establish a *prima facie* ACRA discrimination case by failing to present evidence demonstrating (a) the nature, severity, duration, and impact of his physical disability, (b) that his physical impairment substantially limits his ability to perform either a class of jobs or a broad range of jobs across various

-8-

classes, and (c) that he is qualified to perform the essential functions of his job, or a desired job, with or without reasonable accommodation.

## 1. Timeliness of EEOC filing

Under the ACRA, a claim must be filed either (1) within one year after the alleged employment discrimination or (2) within ninety days after receipt of a right-to-sue letter issued by the EEOC. See Ark. Code Ann. § 16-123-107(c)(3).

Although the parties disagree about the last date of alleged discrimination, the latest date considered was February, 1998, which falls outside the limitations period. It is undisputed that Duty filed his claim on June 15, 1999, which is more than one year after the latest possible date of discrimination. Therefore, Duty failed to satisfy the first option for filing a timely claim under the ACRA.

We next consider whether Duty satisfied the second option for filing a timely ACRA claim. NAP concedes that Duty filed suit within ninety days of receiving a right-to-sue letter from the EEOC. However, NAP contests the timeliness of the underlying EEOC filing, contending that because Duty's charge of discrimination was not timely filed with the EEOC, the EEOC's right-to-sue letter is invalid as the basis of the limitations period.

In order for an EEOC right-to-sue letter to begin running the statute of limitations, the underlying EEOC charge of discrimination likewise must have been timely filed. See Douglas v. California Dep't of Youth Authority, 271 F.3d 812, 823 n.12 (9th Cir. 2001) (noting that limitations period of underlying EEOC charge governs statute of limitations for ADA charges in federal court) (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)); see also Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1327 (8th Cir. 1995) (Dring) (holding that failure to file a timely underlying EEOC charge bars pursuit of ADEA action in federal court);

Anderson v. Unisys Corp., 47 F.3d 302, 306 (8th Cir. 1995) (stating that the EEOC administrative deadline "operates in the nature of a statute of limitations" for ADEA claims). According to EEOC regulations, a claimant must file a charge of discrimination with the EEOC within 180 days of the date of discrimination. 42 U.S.C. § 2000e-5(e)(1). The date of discrimination is considered to be the date on which the last discriminatory act forming the basis of the complaint occurred. See id.

NAP characterizes the last day of the alleged discrimination as September 18, 1997, the date that Duty received White's September 15, 1997 letter. NAP asserts that the latest possible date a jury reasonably could assess as Duty's notice of termination was December 11, 1997, the date of Duty's telephone call to White, in which she told him that his employment was terminated as far as she was concerned. See Jones v. Baskin, Flaherty, Elliott & Mannino, P.C., 738 F. Supp. 937 (W.D. Pa. 1989) (holding that limitations period began when an unofficial committee informed the plaintiff of his termination), *aff'd,* 897 F.2d 522 (3d Cir.), *cert. denied*, 498 U.S. 811 (1990). NAP argues, therefore, that Duty's EEOC claim was time-barred because it was not filed within 180 days of December 11, 1997.

However, the jury determined that NAP terminated Duty on January 8, 1998. We find nothing unreasonable in the jury's conclusion. The jury was instructed properly by the district court that "[a] person is considered to have been terminated by his employer 'on the date on which he receives notice which would inform a reasonable person in his position that he had been terminated.'" Dring, 58 F.3d at 1327 (holding that the limitations period on a federal discrimination claim governed by an underlying EEOC charge begins on "the date on which the adverse employment action is communicated to the plaintiff"). As a result, the jury assessed Duty's official date of termination, which serves as the beginning of the limitations period for the underlying EEOC charge, as January 8, 1998, the date he received an official letter from someone with actual termination authority at NAP. See Delaware State College v. Ricks, 449 U.S. 250, 261 (1980) (holding that the accrual date begins

-10-

when the notice communicates an official decision of the employer); <u>see also</u> <u>Smith v. UPS, Inc.</u>, 65 F.3d 266 (2d Cir. 1995) (holding that, under the ADA, "for the notice to be effective, it must be made apparent to the employee that the notice states the 'official decision' of the employer"); <u>Burfield v. Brown, Moore & Flint, Inc.</u>, 51 F.3d 583, 589 (5th Cir. 1995) (holding that limitations period begins when claimant receives unequivocal notice of the facts underlying the claim or when a reasonable person would know of those facts).

Moreover, it was rational for the jury to find that (1) Duty believed that White's phone call was not an official termination because she did not have the authority to terminate him, especially without consulting the panel of supervisors who were responsible for hiring and firing, and (2) the letter he received on January 8, 1998, was the only official communication of NAP's decision to fire him. <u>See</u> <u>Cooper v. St. Cloud State University</u>, 226 F.3d 964 (8th Cir. 2000) (determining that the limitations period began when the plaintiff exhibited actual awareness of the employer's termination decision). As a result, we conclude that the district court did not err in determining that sufficient evidence existed for a jury reasonably to determine that Duty's EEOC charge of discrimination was timely filed and therefore his ACRA claim was not time-barred.

*2. Disability Claim*

At the outset, we note that we analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* <u>See</u> Ark. Code Ann. § 16-123-105(c); <u>Greer v. Emerson Electric Co.</u>, 185 F.3d 917, 920-21 (8th Cir. 1999) (applying federal ADA analysis to disability discrimination claim brought under ACRA); <u>Land v. Baptist Medical Center</u>, 164 F.3d 423, 425-26 (8th Cir. 1999) (holding that it is necessary to "consider analogous federal ADA decisions" when interpreting disability claims under the ACRA because "[t]he definition of disability

in both the ACRA and the ADA are in all relevant respects the same"); Flentje v. First Nat'l Bank of Wynne, 11 S.W. 2d 531 (Ark. 2000) (stating that because so few ACRA cases have been decided by Arkansas courts, federal law interpreting equivalent discrimination claims are used to aid in analysis).  An ADA claimant must make a *prima facie* showing that he (1) has a disability within the meaning of the ADA, (2) is able to perform the essential functions of the job, with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of the disability.  Kellogg v. Union Pacific R.R., 233 F.3d 1083, 1086 (8th Cir. 2000) (Kellogg).

a.      *Disability Within the Meaning of the ADA*

In order to establish a disability within the meaning of the ADA, a claimant must establish (1) a physical or mental impairment that substantially limits a major life activity,[3] (2) a record of such impairment, and (3) that he is regarded as having such an impairment.  See id. at 1086; Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir. 2000) (Cravens).

NAP argues that Duty failed to prove that he was substantially limited in his major life activity of working because he did not submit sufficient evidence regarding (1) the nature, severity, duration and impact of his disability, and (2) his inability to perform either a class of jobs or a broad range of jobs across various classes.  See 29

---

[3]We recognize that the Supreme Court has not ruled conclusively that working constitutes a major life activity for purposes of applying the ADA.  See Toyota Motor Mfg. Kentucky, Inc. v. Williams, 534 U.S. 184 (2002).  For the sake of applying the ADA analysis to Duty's ACRA claim, we accept that Duty's disability is premised upon his restriction in the major life activity of working because the parties have not contested the validity of a working restriction as the basis of a disability claim in this appeal.  See Kellogg v. Union Pacific R.R., 233 F.3d 1083, 1087 (8th Cir. 2000) (assuming, without deciding, that working is a major life activity under the ADA) (citing Sutton v. United States Air Lines, Inc., 527 U.S. 471, 492 (1999) (same)).

C.F.R. § 1630.2(j)(2)(i)-(iii), (3)(ii) (EEOC regulations requiring evaluation of (1) the nature, severity, duration and impact of a disability and (2) consideration of the claimant's ability to perform either a class of jobs or a broad range of jobs across various classes to determine whether a major life activity is substantially limited). For the reasons stated below, we disagree.

*(i)     The Nature, Severity, Duration, and Impact of Duty's Physical Disability*

NAP maintains that Duty's heavy lifting restriction alone was insufficient probative evidence regarding the nature, severity, and duration of Duty's physical impairment and how it substantially limited his ability to work, especially because Duty continues to perform heavy work by comfortably lifting up to fifty pounds, and by working between forty and sixty hours a week on his farm baling hay and driving a dump truck. See Mellon v. Federal Express Corp., 239 F.3d 954, 957 (8th Cir. 2001) (stating that, as a matter of law, a disability claim premised on a lifting restriction alone must be rejected).

Duty presented evidence at trial to illustrate the nature, severity, duration and impact of his impairment, including (1) symptoms of chilling occurring several times a week and lasting approximately forty-five minutes, (2) chronic neck pain present approximately ninety percent of the time, (3) weakness, (4) numbness in his groin and hands, (5) upper arm pain, and (6) headaches. A jury reasonably could conclude that these symptoms indicated a permanent disability beyond a lifting restriction. As a result, we conclude that the district court did not err in determining that sufficient evidence existed regarding the nature, severity, duration and impact of Duty's disability to sustain his ACRA claim.

*(ii)* *Limitation on Duty's Ability to Perform Either a Class of Jobs or a Broad Range of Jobs Across Various Classes*

NAP argues that Duty failed to meet his burden of showing that he was unable to perform either an entire class of jobs or a broad range of jobs in various classes compared to the average person with comparable training, skills, and abilities. Specifically, NAP contends that the vocational consultant's assessment only excluded Duty from a portion of jobs within a class of jobs, not an entire class of jobs or a broad range of jobs across various classes. NAP claims that the vocational consultant neglected to consider other work that Duty performed at NAP, such as electrical and truck-driving work, as well as Duty's farm work and other maintenance mechanic jobs that do not require heavy lifting. Because Duty did not apply for available jobs in his field, NAP contends that the jury had no evidence regarding the number and kind of jobs available to him, making it unreasonable for the jury to conclude that Duty's work restrictions disqualified him from those jobs.

At trial, Duty presented evidence to demonstrate that NAP regarded him as significantly restricted in the major life activity of working, including (1) evidence of his lifting restriction which disqualified him from the type of work in which he is trained, (2) evidence of his lack of education, (3) evidence of his relatively advanced age, and (4) the vocational consultant's affidavit, which found him to be disqualified from the available jobs in his working area based on his disability.

Moreover, the relevant EEOC regulation, 29 C.F.R. § 1630.2(j)(3)(ii), states that

> [a]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs. This would be so

even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs.

As a result, the jury reasonably could conclude that Duty met his burden of showing that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Webb v. Garelick Mfg. Co., 94 F.3d 484 (8th Cir. 1996). Consequently, we hold that the district court did not err in determining that sufficient evidence existed regarding Duty's inability to perform a class of jobs or a broad range of jobs.

b.      *Duty's Ability to Perform the Essential Functions of His Job*

NAP asserts that Duty failed to present sufficient evidence that he could perform the essential functions of his job, with or without reasonable accommodation. Rather, NAP maintains that (1) because heavy lifting and climbing are necessary parts of Duty's job, the evidence established that Duty could not perform his job within his medical restrictions, (2) no reasonable accommodation could have been made to enable Duty to perform his job, because alternative lifting devices were unsafe and inaccessible to certain parts of the plant, and (3) the plant did not have any available positions Duty could have performed with his restrictions.

At trial, Duty submitted evidence to demonstrate that he was able to perform the essential functions of the maintenance mechanic job, including (1) his own testimony that he was capable of lifting 100 to 150 pounds occasionally, fifty to seventy-five pounds regularly and fifty pounds comfortably; (2) his testimony that heavier lifting was not an essential function of the job, because he had done such lifting only four or five times in his eighteen years on the job; (3) evidence that a variety of lifting devices were available to do any necessary heavier lifting; (4) evidence regarding NAP's available positions of rebuilder, sizing operator, ball

mill operator, STS operator, and material handler, all of which he could have performed with his restrictions; (5) evidence of other employees hired to perform jobs he was capable of doing; (6) evidence that the "no-rehire" policy was not the reason he was not given another position; and (7) evidence that other employees had returned to work when they were less than 100% capable of performing their essential job functions.

Moreover, Duty testified that he had requested an accommodation, that White was well aware of his restrictions, and that NAP made no effort to determine if he could do his job with reasonable accommodation or to reassign him to a different job. See Cravens, 214 F.3d at 1018 (holding that employers are obligated to consider reassignment as part of their reasonable accommodation duty under the ADA). Therefore, we hold that the district court did not err in determining that the jury reasonably could conclude that Duty was a qualified individual with a disability who could perform the essential functions of his former position or other positions at NAP.

B.    FMLA Claim

NAP contends that the district court erred in finding sufficient evidence to support the jury's verdict regarding Duty's FMLA claim because: (1) the FMLA only entitles employees to twelve weeks leave, which Duty had exhausted long before he was terminated, and (2) Duty was not entitled to job restoration because (a) he failed to carry out his obligations under the FMLA, and (b) he was unable to perform the essential functions of his job at the end of his medical leave.

1. *Exhaustion of FMLA Leave Prior to Termination*

NAP argues that the district court erred by equitably estopping NAP from asserting an affirmative defense that Duty had exhausted the twelve weeks of FMLA

leave to which he was entitled on July 10, 1997,[4] thereby barring him from asserting any claims under the FMLA. See 29 U.S.C. § 2612(a)(1) (entitling an FMLA disability claimant to twelve work weeks of leave). In denying this defense, the district court reasoned that, because Duty could have relied to his detriment on NAP's September 15, 1997 letter informing him that his entire 34-week sick leave qualified under the FMLA, NAP was estopped from claiming that Duty's leave was confined to the twelve weeks dictated by the FMLA. NAP contends that it should not be penalized for extending to Duty more benefits than the FMLA requires. See Ragsdale v. Wolverine World Wide, Inc., 218 F.3d 933, 937 (8th Cir. 2000), *aff'd*, 122 S.Ct. 1155 (2002) (filed Mar. 19, 2002).

We review the district court's preclusion of NAP's proposed affirmative defense based on equitable estoppel principles for an abuse of discretion. See Movie Sys., Inc. v. Heller, 710 F.2d 492, 495 (8th Cir. 1983) (treating equitable estoppel as an affirmative defense); accord Spaulding v. United Transp. Union, 279 F.3d 901, 911 (10th Cir. 2002) (reviewing equitable estoppel decisions for abuse of discretion); Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1364 (Fed. Cir. 2001) (same); Grigson v. Creative Artists Aency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000) (same); Santa Maria v. Pacific Bell, 202 F.3d 1170, 1175 (9th Cir. 2000) (same); McNemar v. Disney Store, Inc., 91 F.3d 610, 613 (3d Cir. 1996) (same). "The principle of [equitable] estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." Farley v. Benefit Trust Life Ins. Co, 979 F.2d 653, 659 (8th Cir. 1992); see also Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59 (1984) (referring to the Restatement (Second) of Torts

---

[4]This date marks twelve weeks from April 17, 1997, as the first day of Duty's FMLA leave, even though NAP's September 15, 1997 letter designated December 10, 1997, as Duty's final day of FMLA leave. In addition, neither party discusses the impact of Duty's short-term disability benefits on his FMLA leave. NAP provided Duty with short-term disability benefits until mid-October 1997.

§ 894(1) to define equitable estoppel as warranted in situations where one person has misrepresented facts and another person reasonably relies on the misrepresentation to his or her detriment).

In the present case, the district court determined that (1) NAP sent Duty the September 15, 1997 letter; (2) the letter explicitly guaranteed Duty FMLA leave until December 10, 1997; and (3) Duty either did or reasonably could have relied on the specified leave time to his detriment. Because Duty called White on December 11, 1997, the day immediately following the end of his FMLA leave as designated in the September 15, 1997 letter, we may infer that Duty did rely on the leave time period defined in that letter. Furthermore, because Duty's FMLA leave intermingled with his short-term disability leave, it was not unreasonable for him to rely on the amount of leave time designated by NAP. As a result, we find no abuse of discretion in the district court's determination that NAP should be equitably estopped from contesting Duty's eligibility to assert a claim under the FMLA. See Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 724-25 (2d Cir. 2001) (affirming the district court's decision to estop an employer from asserting an affirmative defense challenging an employee's FMLA eligibility when the employer's unintentional misleading behavior caused the employee to justifiably and detrimentally rely on the FMLA leave); see also Woodford v. Community Action of Greene County, Inc., 268 F.3d 51, 57 (2d Cir. 2001) (authorizing equitable estoppel where an employer initially provided notice of eligibility for leave and later seeks to challenge it); Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579, 582 (7th Cir. 2000) (recognizing a district court's ability to equitably estop employers from asserting an affirmative defense contesting an employee's entitlement to FMLA leave in situations where the employer's words or conduct has misled the employee into relying on the leave).

*2.      Entitlement to Job Restoration*

NAP maintains that Duty was not entitled to job restoration because (1) he failed to carry out his obligations for returning to work under the FMLA and (2) he could not perform the essential functions of his job.

*a.      Duty's FMLA Obligations*

NAP claims that no jury reasonably could have concluded that Duty was entitled to job restoration pursuant to the FMLA because (1) Duty did not return to work on December 11, 1997, and (2) Duty did not present a physician's release-to-work certificate to comply with NAP's return to work policy. See 29 U.S.C. § 2614(b)(1)(c) (requiring employees to return to work for FMLA coverage), (a)(4) (enabling employers to condition job restoration on a uniform policy requiring employees to present certification from a health care provider to return to work).

Duty submitted sufficient evidence for a jury reasonably to infer that he did qualify for job restoration under the FMLA because he testified that (1) he did attempt to return to work on December 11, 1997, by telephoning White to find out what she expected of him in order to return to work, and (2) he did comply with the requirement in the NAP employee handbook of providing "a medical release to return to work" by submitting the November 20, 1997 statement from Dr. Keyashian releasing him to return to work with a heavy lifting restriction. As a result, we conclude that the district court did not err in determining that sufficient evidence existed to support the jury's finding that Duty fulfilled his obligations under the FMLA.

*b.*     *Duty's Ability to Perform the Essential Functions of His Job*

NAP argues that it was unreasonable for the jury to conclude that Duty was entitled to restoration to his former position or another position at NAP pursuant to the FMLA because Duty was not capable of performing the essential functions of his job.

To determine whether an employee is capable of performing the essential functions of his job for purposes of FMLA entitlement, we do not utilize the same criteria outlined by the ADA and courts interpreting it. See Stekloff v. St. John's Mercy Health Sys., 218 F.3d 858, 861 (8th Cir. 2000). Rather, because "the declared purposes of the FMLA and its legislative history" are concerned with maintaining job security, an FMLA inquiry examining the employee's ability to perform the essential functions of his job focuses "on [his] ability to perform those functions in [his] current environment." Id. at 861-62.

We have discussed already, in Part I(A)(2)(b) of this opinion, the jury's basis for finding that Duty was capable of performing the essential functions of his job in relation to the ACRA claim. We find the jury's reasoning to be even more compelling in the FMLA context, which requires only that Duty demonstrate his ability to perform the essential functions of his former job at NAP. As a result, we hold that the district court did not err in determining that sufficient evidence existed to support the jury's finding that Duty was entitled to job restoration.

## II.     **Denial of Motion for a New Trial**

We review the denial of a motion for a new trial for a clear abuse of discretion. Fed. R. Civ. P. 59(a); Douglas, 207 F.3d at 477. For the reasons already presented in affirming the district court's denial of judgment as a matter of law, we conclude

that the district court did not clearly abuse its discretion in denying NAP's motion for a new trial.

### III.    Admission of Evidence Regarding Whether Duty Qualified as an "Eligible Employee" Under the FMLA

NAP argues that the district court abused its discretion in refusing to admit evidence showing that Duty was not an eligible employee for FMLA purposes and therefore not entitled to FMLA leave.  NAP contests the district court's refusal to admit into evidence Duty's daily time cards from October 1996 though September 1997 to substantiate its allegation that Duty did not work at least 1,250 hours during the twelve preceding months and thus did not work the requisite number of hours to qualify as an eligible employee under the FMLA.  See 29 U.S.C. § 2611(2)(A)(ii).  In excluding the proffered evidence, the district court reasoned that NAP was estopped from claiming that Duty was an ineligible employee on the basis of the September 15, 1997 letter, in which NAP categorized Duty as eligible for FMLA coverage.  NAP argues that the district court abused its discretion by bestowing greater rights upon Duty than conferred by the FMLA, which does not contain any language estopping an employer from asserting that an employee is not eligible for benefits.

We review the exclusion of evidence for a clear and prejudicial abuse of discretion.  See Thorson v. Gemini, 205 F.3d 370, 382 (8th Cir. 2000).   We have concluded already that Duty was entitled to rely on the leave period defined by the September, 15, 1997 letter (as discussed in Part I(B)(1) of this opinion).  Applying the same reasoning, we hold that the district court did not abuse its discretion in excluding the time cards from evidence because the September 15, 1997 letter entitled Duty to rely on the FMLA leave described therein.

**IV. Remittur of Compensatory and Punitive Damages Awards**

NAP contends that it is entitled to a remittur of the compensatory and punitive damages awards because (1) there was insufficient evidence to support the compensatory damages award for back pay, (2) Duty failed to mitigate the damages involved in the back pay award, and (3) there was insufficient evidence to support the punitive damages award. We review the denial of remittur for clear abuse of discretion, and will grant a remittur only in cases where the jury's award is "'so grossly excessive as to shock the court's conscience.'" See Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1061-62 (8th Cir. 1993) (quoting Benny M. Estes & Assocs. v. Time Ins. Co., 980 F.2d 1228, 1235 (8th Cir. 1992)).

A.      Compensatory Damages

NAP claims that Duty was not entitled to compensatory damages because he failed to demonstrate genuine injury as a result of his termination by failing to present any evidence of (1) out-of-pocket expenses incurred as a result of NAP's conduct, or (2) physical symptoms related to severe emotional distress.

Under the FMLA, an employer is liable for "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617(1)(A)(i)(I). The district court properly instructed the jury to assess damages actually sustained by Duty, including lost wages and fringe benefits as well as compensation for "mental anguish, loss of dignity, and other intangible injuries." Appellee's Appendix at 218. Sufficient evidence supported the jury's compensatory damages award, including Duty's and his wife's testimony that Duty suffered emotionally after losing his job. See Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190 (8th Cir. 2000) (testimony from plaintiff and spouse regarding plaintiff's loss of dignity and self-esteem, along with feeling of emptiness, deemed sufficient to sustain compensatory damages award for emotional distress under

-22-

FMLA). The jury reasonably could have relied on this testimony to assess compensatory damages.

B.    Mitigation of Compensatory Damages

NAP argues that Duty failed to mitigate his alleged damages by attempting to find work, thereby excluding him from eligibility for back pay.

In calculating the compensatory damages award, the jury considered (1) evidence that Duty earned considerably less from his farm work than he did from his NAP job, (2) the affidavit from Duty's vocational consultant classifying Duty as disqualified from other jobs on the basis of his disability, and (3) the lack of any evidence submitted by NAP showing that any jobs were available for which Duty would have been qualified. As a result, it was not unreasonable for the jury to conclude that NAP did not meet its burden of proving that Duty failed to mitigate his damages. Therefore, the district court did not err in determining that the jury reasonably could disregard Duty's alleged failure to mitigate his damages in calculating the amount of the back pay award.

C. Punitive Damages

NAP argues that there was insufficient evidence for the jury to conclude that NAP intentionally discriminated against Duty or engaged in any extraordinary misconduct to warrant punitive damages under the ACRA.

The jury was instructed that NAP's refusal to return Duty to work should be considered intentional discrimination if (1) NAP knew it was acting in violation of Arkansas law prohibiting disability discrimination or (2) NAP acted with reckless disregard of that law. See Broadus v. O.K. Industries, Inc., 226 F.3d 937, 943 (8th Cir. 2000) (affirming punitive damages resulting from ACRA violations); Denesha

v. Farmers Ins. Exch., 161 F.3d 491, 503 (8th Cir. 1998) (Denesha) (stating that because the "policy objectives of punitive damages are punishment and deterrence," the amount awarded should reflect the severity of the defendant's misconduct). In response, the jury found evidence that NAP intentionally discriminated against Duty, including: (1) Duty's desire to return to work, (2) the absence of any effort by NAP to return Duty to work unless he functioned at 100% capacity, (3) NAP's restoration of other employees to work at less than 100% capacity, and (4) the availability of other jobs at NAP. As a result, it was not unreasonable for the jury to conclude that NAP had intentionally discriminated against Duty and award punitive damages. See Madison v. IBP, Inc., 257 F.3d 780, 794 (8th Cir. 2001) (upholding punitive damages for employment discrimination where "'the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual'") (quoting Kolstad v. American Dental Ass'n, 527 U.S. 526, 530 (1999)); Foster v. Time Warner Entertainment Co., 250 F.3d 1189, 1197 (8th Cir. 2001) (authorizing punitive damages for intentional discrimination in an ADA claim); Denesha, 161 F.3d at 504 (holding that "the inference of discriminatory animus" established the "outrageousness necessary to support an award of punitive damages").

Because the jury permissibly relied on this evidence to support its compensatory and punitive damages awards, we hold that the district court did not abuse its discretion in denying NAP's motion for remittur.

## V. Liquidated Damages Award

The FMLA authorizes a court to deny liquidated damages when a defendant proves that the FMLA violation "was in good faith and . . . the employer had reasonable grounds for believing that the act or omission was not a violation." 29 U.S.C. § 2617(a)(1)(A)(iii). NAP asserts that the district court erred in failing to vacate the liquid damages award by neglecting to recognize NAP's entitlement to the

good faith exception as demonstrated by (1) granting approximately 34 weeks of FMLA leave to Duty, (2) providing Duty with adequate notice regarding his leave, and (3) terminating Duty only after he failed to return to work twelve weeks after receiving that notice. See Thorson v. Gemini, Inc., 205 F.3d 370, 384 (8ᵗʰ Cir. 2000) (invoking the FMLA good faith exception to liquidated damages) (citing 29 U.S.C. § 2617(a)(1)(A)(iii)).

We review the grant of liquidated damages pursuant to the FMLA for an abuse of discretion. See id. at 383. In formulating the liquidated damages award, the jury considered evidence that NAP (1) consistently refused to return Duty to his former job unless he functioned at 100% capacity, and (2) made no effort to determine whether Duty was capable of performing the essential functions of his job . Because the correct standard for job restoration under the FMLA is whether the employee can perform the essential functions of his former position, see 29 C.F.R. § 825.214(b), not whether he can function at 100% capacity, it was not an abuse of discretion for the district court to uphold the jury's determination that NAP did not act in good faith and thus was not entitled to an exemption from liquidated damages liability.

## Conclusion

Accordingly, the judgment of the district court is affirmed.

NANGLE, District Judge, concurring.

I concur with the majority opinion herein. However, I feel compelled to provide further comment on one issue in the case: the major life activity of working.[5]

---

[5]As Judge McMillian noted in the majority opinion, Appellant did not contest the validity of the major life activity of working in this appeal. However, I believe this case shows how the EEOC regulations expand the scope of the Americans with Disabilities Act ("ADA") by allowing plaintiffs to prove a disability by showing that

Although the majority's opinion correctly states and applies the law as it currently stands, I remain concerned that the EEOC regulations defining the "major life activity of working" have expanded the Americans with Disabilities Act ("ADA") protections beyond the intent or expectations of Congress. Mr. Duty established his Arkansas Civil Rights Act ("ACRA") claim by asserting that his disability substantially limits his ability to perform the major life activity of working.[6] According to the EEOC regulations, to be substantially limited in the life activity of working, a plaintiff must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Only under the current analytical framework could Mr. Duty, a man who can lift 100 to 150 pounds occasionally; 50 to 75 pounds on a regular basis; and 50 pounds comfortably, be considered disabled. However, he was indeed able to obtain disability status by presenting a carefully crafted affidavit which explained how his lifting restrictions impacted his ability to serve as a maintenance mechanic in the Fort Smith, Arkansas area. In my opinion, Congress did not intend to extend ADA protections to such impairments.

In drafting the ADA, Congress sought to protect individuals with <u>disabilities</u>. In its findings, Congress emphasized that individuals with disabilities needed the ADA protections because:

> [I]ndividuals with disabilities are a <u>discrete</u> and <u>insular</u> <u>minority</u> who have been faced with restrictions and limitations, subjected to a <u>history of purposeful unequal</u>

they are substantially limited in the major life activity of work. Thus, I feel compelled to provide brief commentary on this issue.

[6]As Judge McMillian emphasized above, we analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims under the ADA, 42 U.S.C. § 12101 <u>et seq.</u>

treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society . . . .

42 U.S.C. § 12101(a)(7) (emphasis added). Congress further noted that individuals with disabilities historically have suffered discrimination in areas such as employment, housing, and public accommodations and that such discrimination prevents disabled individuals from enjoying the benefits of the free American society. 42 U.S.C. § 12101.

The ADA defines disability as "physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ." Unfortunately, the ADA does not further define "major life activities;" instead, the EEOC elaborated on the phrase by concluding that major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning and working. 20 C.F.R. § 1630.2(i) (1998). The EEOC stated, however, that the major life activity of "working" is to be considered as a last resort only "[i]f an individual is not substantially limited with respect to any other major life activity." 29 C.F.R. pt 1630, App. § 1630.2(j) (1998).

By permitting an individual to prove a disability by showing a substantial limitation in the ability to work, the EEOC regulations greatly expand the scope of the term "disabled." The ADA clearly covers typical disabilities such as quadriplegia, paraplegia, cerebral palsy, limb loss, and total blindness or deafness. Michel Lee, Searching for Patterns and Anomalies In The ADA Employment Constellation: Who Is A Qualified Individual With A Disability And What Accommodations Are Courts Really Demanding?, 13 Lab. Law. 149, 153-54 (1997). As was discussed above, individuals with such disabilities have had to overcome substantial barriers in public

accommodations as well as in the workplace. However, by allowing an individual to prove a "disability" through the major life activity of "working," the ADA protections now extend to a "seemingly endless array of impairments and conditions that are not intuitively or universally perceived as disabilities . . . ." Id. By pleading under the major life activity of working, an individual with a back injury is considered disabled simply because he presents evidence that his injury limits his ability to work - regardless of whether his back injury otherwise impacts his daily life. I would argue, however, that if a back injury is sufficiently severe to constitute a disability, then such an individual should be able to present evidence that he is substantially limited in other aspects of his life as well. See, e.g., Mullins v. Crowell[7], 74 F. Supp. 2d 1067, 1141 (N.D. Ala. 1999), rev'd, 228 F.3d 1305 (11th Cir. 2000) ("[A] limitation on working is not a limitation on a basic aspect of human functioning. Rather, it is a consequence – albeit in many cases greatly unfortunate – of a limitation on an area of basic human functioning."). Otherwise, the scope of the ADA reaches far beyond

_____

[7]Unlike the instant case, the primary issue before the court in Mullins was whether working should constitute a major life activity. Thus, the district court in Mullins specifically considered whether an individual can predicate an ADA claim on a substantial limitation in the major life activity of work. Mullins, 74 F. Supp. 2d at 1137-1142. The district court concluded that working is not a major life activity: "Working cannot be a major life activity . . . working is not a life activity in the sense that it is an aspect of basic human physical or mental functioning. A limitation in one's ability to work is contingent upon an impairment's limiting some other area of physical or mental functioning. It makes sense to say that one is limited in his or her ability to work because he or she is limited in his or her ability to see; it makes no sense to say the contrary." Id. At 1141. Although the Eleventh Circuit reversed the district court's conclusion, it did not address the district court's thoughtful analysis. Instead, the Eleventh Circuit deferred to the Supreme Court's holding in Sutton and concluded that "our precedent treating working as a 'major life activity' is still valid and the district court erred by interpreting the Act contrary to our precedent." Mullins, 228 F.3d at 1313. I believe the time has come for the Circuits to begin to consider whether the EEOC acted beyond the scope of its authority by including the activity of working in its list of major life activities.

those individuals who, because of a disability, cannot freely participate and contribute to American society.

The Supreme Court recently stated that "[t]here is no support in the Act, our previous opinions, or the regulations for the . . . idea that the question of whether an impairment constitutes a disability is to be answered only by analyzing the effect of the impairment in the workplace." Williams v. Toyota Motor Manufacturing, Kentucky, Inc., 534 U.S. 184, 122 S. Ct. 681, 692-93, 151 L.Ed.2d 615 (2002). In my view, an individual should not be able to prove a disability merely by showing the effect of an impairment in the workplace. An individual who is truly disabled is impaired regardless of the context: A paraplegic is substantially limited in his ability to walk at the workplace, on public transportation, and at home. A finding that a person is limited from performing a "class of jobs" or a "broad range of jobs" does not support a conclusion that the individual is disabled if that individual is not impaired when performing another line of work. The major life activity of working allows an individual to obtain disability status by diverting attention away from a physical and mental impairment and toward his line of work.

In Sutton v. United Airlines, 527 U.S. 471, 492, 119 S. Ct. 2139, 144 L.Ed.2d 450 (1999), the Supreme Court noted, for the first time, that there "may be some conceptual difficulty in defining 'major life activities' to include work, for it seems "to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap." Id.; see also Williams v. Toyota Motor Manufacturing, Kentucky, Inc., 534 U.S. 184, 122 S. Ct. 681, 692-93, 151 L.Ed.2d 615 (2002). The proof problem associated with the major life activity of working lies in an individual's ability to substantiate a disability by focusing on his line of work instead of his impairment.

-29-

The circularity arising from defining a disability through the major life activity of working is apparent in this case. At trial, Mr. Duty presented evidence that he was diagnosed with degenerative disc disease which manifests itself in a variety of symptoms including chronic neck pain and numbness of the hands. Mr. Duty also presented an affidavit from a vocational consultant specifically tailored to substantiate his claim that his lifting restriction prevents him from performing a "broad range of jobs." See Dale A. Thomas's Affidavit at 4 ("Mr. Duty is precluded from a broad range of jobs within this class of jobs that he is able to perform using skills from past work."). Based on evidence of an impairment and an artfully drafted affidavit, Mr. Duty presented sufficient evidence to substantiate his claim that his alleged disability substantially restricts his ability to work. Pursuant to the current analytical framework, the majority opinion correctly concluded that the district court properly denied defendant's motion for a judgment as a matter of law. See 29 C.F.R. § 1630.2(j)(3)(i); Sutton, 527 U.S. at 491-92.

Nevertheless, I harbor serious reservations regarding Mr. Duty's disability status. Mr. Duty did not present any evidence that his impairment limits his life outside of the workplace. In spite of his lifting restriction, Mr. Duty testified that he is capable of lifting 100 to 150 pounds occasionally; 50 to 75 pounds on a regular basis; and 50 pounds comfortably. Mr. Duty further testified that he can work on his farm performing strenuous activities such as bailing hay between 40 and 60 hours a week. If Mr. Duty had been working on a farm when he developed his impairment, then he would not have been labeled "disabled." In my view, this is a case in which the tail is wagging the dog - the position is defining the disability. Outside the context of "maintenance mechanics positions in Fort Smith, Arkansas," Mr. Duty would not be considered "disabled," and yet, under the current legal framework, he was able to recover under the ADA. In my opinion, this case is a prime example of how the major life activity of working is being used to expand the ADA's reach.

Under the current state of the law, I must concur in the opinion of my esteemed colleagues; however, I remain concerned about the EEOC regulations which allow individuals to prove a disability merely by demonstrating a substantial limitation in the major life activity of working.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.