# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1498

_____

Michael Ray Reed,

        Appellant,

    v.

Lear Corporation,

        Appellee.

\*
\*
\*   Appeal from the United States District
\*   Court for the Eastern District of
\*   Missouri.
\*
\*
\*
\*

_____

Submitted: September 26, 2008
Filed: February 12, 2009

_____

Before BYE, BEAM, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

On January 5, 2006, Michael Reed sued his former employer, the Lear Corporation ("Lear"), under the Family and Medical Leave Act ("FMLA"). See 29 U.S.C. § 2601 *et seq.* He alleged that Lear violated the FMLA when it fired him for absences he incurred in reliance on Lear's representation to him that he was on provisional FMLA leave. On January 31, 2008, the district court[1] granted Lear's motion for summary judgment. Reed appealed. We affirm.

_____

[1]The Honorable Stephen M. Limbaugh, Sr., United States District Judge for the Eastern District of Missouri, now retired.

In August 1997, Reed began working at Lear's plant in Bridgeton, Missouri, which supplies car and truck seats to Chrysler. Reed worked on an assembly line as a rear seat assembler. His job involved heavy lifting and significant bending and twisting, and over time he developed back problems. In 2003, Reed began seeing a chiropractor, Dr. Colaneri, as a result of his back's deteriorating condition. Dr. Colaneri diagnosed Reed with arthritis, a bulging disc, and a lesion on his spine. The record indicates that Reed was frequently absent from work during this period.

In August 2003, Lear implemented a new attendance policy in response to an ongoing absenteeism problem at its Bridgeton plant. Approximately 20 to 40 percent of the plant's employees were absent on a daily basis. Under the old policy, Lear would excuse absences if the employee provided a timely doctor's note. The new policy was a "no fault" point system, under which each day of absence would be penalized three points regardless of the reason for the absence. If an employee missed up to three consecutive days due to illness and substantiated the illness with a doctor's note, Lear would record the absences as a single incident and assess only three points. Accumulating 24 points in any 12-month period would result in the employee's termination. The new attendance policy excepted vacation days and FMLA-qualifying leave from the point system.

Reed entered the new system with eight points assessed against him as a result of being subject to disciplinary sanctions under the old system. After the implementation of the new system on August 1, 2003, Reed's absences continued. On September 3, 2003, Lear notified Reed in writing that he was at risk of termination due to excessive absences. After this first warning, Reed continued to miss work. Lear warned him again on October 15, 2003, that he was close to exceeding the 24-point threshold. At this point, he had accumulated 21 points.

Around the time of this second warning in October 2003, Reed visited the company nurse. The nurse suggested that he apply for FMLA leave and directed him to the Human Resources Department to obtain the paperwork. The packet of paperwork contained information on how to fill out the necessary forms and directed employees to call the Bridgeton plant's Human Resource Specialist, Scott Patsaros, if they had any questions about their request for FMLA leave. Information in the packet stated that incomplete forms would not be reviewed and that an employee must provide a medical certification from a licensed health care provider attesting that the employee is unable to work due to illness or injury. It also stated that any time an employee took off before official approval for FMLA leave would not be protected if the request for leave was ultimately denied.

After picking up the FMLA packet on October 15, 2003, Reed continued to miss work. Reed submitted his request for FMLA leave, along with a medical certification form filled out by Dr. Colaneri, on October 21, 2003. He sought FMLA protection for future absences as well as his absences incurred after October 1, 2003. On the form, Dr. Colaneri indicated that Reed was "not presently incapacitated" and that it was not necessary for Reed to work less than a full schedule. At his deposition, Dr. Colaneri acknowledged that, at the time he completed the forms, he believed that Reed could perform the essential functions of the job.

On November 4, 2003, Reed was given a letter from Patsaros denying his request for FMLA leave and explaining that his request had been denied because Dr. Colaneri had not indicated that his condition necessitated time off from work. Lear's Human Resources Manager, Ron Conrad, also notified Reed that he was being terminated due to excessive absences. However, Lear rescinded Reed's termination on November 6, 2003, as a result of a plant-wide rollback of attendance points. Lear reinstated him on November 10, 2003, with 15 attendance points assessed against him.

On the day of his reinstatement, Reed resubmitted his FMLA request with a second medical certification form filled out by Dr. Colaneri. This second form also failed to contain a certification that Reed could not work due to his back problems. On the form, Dr. Colaneri stated that he could not determine the full extent of Reed's problems until after Reed's scheduled visit to a neurosurgeon on November 26, 2003.

On November 26, the day of his scheduled visit with the neurosurgeon, Reed received a second letter from Scott Patsaros rejecting his November 10, 2003 FMLA request. The letter stated, in pertinent part:

> Under the Act, once an event takes place that the employee believes may fall under the [FMLA], the employee has 2-days[2] to inform their employer that it may be FMLA qualified and acquire the necessary paperwork. The Company cannot at this time recognize that any such event has happened within a 2-day window prior to the receipt of the paperwork, therefore, the Company is not obligated to honor the certification. The Certification makes note that an upcoming doctor's appointment will take place (Nov 26, 2003) that may make

[2]This is an apparent reference to the two-day window required by 29 C.F.R. § 825.208(e)(1), which states in part: "If leave is taken for an FMLA reason but the employer was not aware of the reason, and the employee desires that the leave be counted as FMLA leave, the employee must notify the employer within two business days of returning to work of the reason for the leave." Section 825.208(e)(1) applies only when an employee attempts retroactively to designate previous absences as FMLA leave after returning to work. See 29 C.F.R. § 825.208(e) ("[e]mployers may not designate leave as FMLA leave after the employee has returned to work with two exceptions," one of which is described in section 825.208(e)(1)). Although the second letter might be correct with regard to time Reed had already taken off from work, it ignores the fact that Reed was also requesting FMLA leave for *future* absences. In this regard, the letter is confusing because it denies Reed's request for leave as if he were only seeking FMLA status for past absences. However, this confusion is irrelevant to the current decision because Reed's estoppel claim rests on the contention that the second letter did not clearly deny his request for FMLA leave. To the contrary, the letter quite clearly denied his request. The only confusion is whether it did so for the right reasons.

-4-

known the full impact of your condition. With the above situations in mind, once you know the impact of your condition, any possible time away from work, and the reasons for the time away from work, the Company will acknowledge a certification that was acquired within the 2-day window as noted above.

The letter goes on to state:

Any time off you declare as Family Medical Leave prior to notification by the Company of "provisional" FMLA or an "official" approval will not necessarily be protected under the Act. You must meet the stipulation above before any consideration for Family Medical Leave will be given.

Reed took this letter to his union steward, Nick Badolato, because he was confused as to its meaning. Reed then went with Badolato to the Human Resources department to ask about the meaning of the letter. They found several people in a meeting in a conference room, and Badolato entered the room to ask about the letter. Reed stayed outside the room with the door open. He claims that although he did not observe the conversation, he overheard someone in the room tell Badolato that his request had not been denied and that he was on provisional FMLA leave.

According to Reed, the person who made this statement was Joel Kato. Kato was not responsible for handling individual requests for FMLA leave, but handled the implementation of the company-wide FMLA program. During the relevant time period, Scott Patsaros was responsible for handling individual FMLA requests at Lear's Bridgeton plant. At his deposition, Reed stated that he was told by his union representative that he was going to see Kato and that he recognized Kato's voice while listening outside the conference room. However, in his affidavit he avers that he "later learned his name was Joel Kato and that he was an HR manager for Lear." Reed did not contact Patsaros about the meaning of the letter. He submitted no affidavit or deposition of Badolato to the district court. Kato stated during his deposition that he did not recall the conversation with Badolato.

Reed missed work on December 5, 6, and 12, 2003. These absences increased his attendance points to 24, and Lear terminated him on January 7, 2004. He never submitted any details about his visit with the neurosurgeon on November 26, 2003.

On January 5, 2006, Reed filed a lawsuit, alleging that Lear should be estopped from denying that his absences were protected under the FMLA by virtue of the statements Reed overheard Kato make to Badolato during their conversation about the second letter. Reed did not contend that Lear improperly denied him leave for which he was eligible. Reed also alleged that Lear violated the FMLA when it refused to designate retroactively his December absences as vacation days. On January 31, 2008, the district court granted Lear's motion for summary judgment. The district court found that: 1) there was no genuine issue of material fact as to Reed's equitable estoppel claim, 2) the lawsuit was barred by the FMLA's two-year statute of limitations, and 3) Lear did not violate the FMLA by refusing to designate retroactively Reed's December absences as vacation leave.

## II.

"We review the district court's grant of summary judgment *de novo*, while granting [Reed], the non-movant, the benefit of all reasonable inferences from the evidence without resort to speculation." Sindecuse v. Katsaros, 541 F.3d 801, 803 (8th Cir. 2008). "Summary judgment is appropriate where the record shows that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005). To overcome a motion for summary judgment, "[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Id.

Under the FMLA, "an eligible employee is entitled to up to twelve weeks of unpaid leave during a twelve-month period '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 471 (8th Cir. 2007) (quoting 29 U.S.C. § 2612(1)(D)). "Because a serious health condition is a prerequisite for FMLA leave, an employee must provide information to the employer to suggest that his health condition could be serious." Id. (quotation omitted). The Department of Labor's regulations implementing the FMLA provide that when an employee has made an initial showing of a serious medical condition, an employer may seek a second or third opinion. See 29 C.F.R. § 825.307(a)(2). If an employer exercises this right, the employee is "provisionally entitled to the benefits of the Act" until the evaluations are concluded. Id.

Equitable estoppel is available to prevent a company from contesting an employee's right to assert a claim under the FMLA. Duty v. Norton-Alcoa Proppants, 293 F.3d 481, 494 (8th Cir. 2002). "The principle of [equitable] estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 659 (8th Cir. 1992); see also Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 59 (1984) (referring to the Restatement (Second) of Torts § 894(1) to define equitable estoppel as warranted in situations where one person has misrepresented facts and another person reasonably relies on the misrepresentation to his or her detriment).

The gravamen of Reed's lawsuit is that Lear represented to him that he was on provisional FMLA leave when he overheard the conversation between Kato and his union representative, Nick Badolato. Reed contends that his reliance on this representation was reasonable because the letter denying his second request was unclear as to whether he was on provisional leave. Furthermore, he claims that the reliance was detrimental because, had it not been for his mistaken belief that he was

on provisional leave, he would have used vacation days to cover the December absences that pushed him over the 24-point threshold and resulted in his termination.

Viewing the evidence in the light most favorable to Reed, we agree with the district court that he has failed to offer evidence that would create a genuine issue of material fact and allow his suit to continue. Reed's reliance on Kato's statement to Badolato was unreasonable as a matter of law. Lear provided Reed with an FMLA information packet containing an open letter to Lear's employees stating that "[a]nything short of a properly completed Certification form will not allow us to authorize leave time under the Family Medical Leave Act." The letter further instructed employees "[a]lso [to] be advised that any time off you declare as Family Medical Leave prior to an official approval from the Company is not protected under the Act if your Family Medical Leave event does not qualify and/or meet the 'final' medical guidelines of your leave." The information packet also contained a document titled "Leave Requested Under the Family Medical Leave Act." This document advised employees about the necessity of providing a form from a health care provider certifying that they are unable to work before they would be eligible for leave. Reed testified that he read through the packet.

Reed submitted his first forms requesting FMLA leave on October 21, 2003. Dr. Colaneri's medical certification form stated that Reed was "not presently incapacitated" and that Reed's condition did not necessitate time off from work. As a result, HR Specialist Patsaros wrote a letter informing Reed that his request was being denied because his medical certification form stated that he did not need time off from work. Reed testified that he understood that his first request for leave had been denied.

Reed then asked Dr. Colaneri to fill out the medical certification form a second time, explaining that the form needed to state that his condition necessitated time off from work before he would be eligible for FMLA leave. Dr. Colaneri indicated on the

second form that he could not make that determination until Reed's scheduled visit to a neurosurgeon on November 26, 2003. As a result of Dr. Colaneri's refusal to certify that Reed's back problems necessitated time off from work, Patsaros wrote the second letter denying Reed's request for FMLA leave, which Reed received on November 26, 2003, the day of his appointment with the neurosurgeon. Reed's suit centers on the meaning of the second letter.

Reed's estoppel claim turns on his contention that the second letter was unclear as to whether it denied his request for leave. The letter invited Reed to resubmit his application after his visit with the neurosurgeon on November 26, 2003, which he never did. Reed claims that this invitation can reasonably be interpreted to mean that Lear was requesting a second medical examination of the type contemplated in 29 C.F.R. § 825.307(a)(2), which permits an employer to seek another opinion after an employee has made an initial showing of a serious medical condition. The employee is then on "provisional" leave until the second (or third) evaluation. However, this provision only applies when a health care provider has certified that an employee's medical condition necessitates time off from work, and Dr. Colaneri never made such a certification. The second letter clearly states that "any time off you declare . . . prior to notification by the Company of 'provisional' FMLA or an 'official' approval will not necessarily be protected under the Act." It also states that "the Company is not obligated to honor the certification."

Moreover, the second letter must be read in the context of the FMLA information packet and Patsaros' first denial letter to Reed. Both the packet and the first letter informed Reed that a form certifying his inability to work was required before he could be considered eligible for FMLA leave. This background should have cleared up any uncertainty Reed felt about the meaning of the second letter. The information packet also instructed employees to contact Scott Patsaros if they had any FMLA-related questions, and Patsaros wrote both letters denying Reed's request for

-9-

leave.  Nonetheless, Reed never contacted Patsaros, or any other member of the Bridgeton plant's HR department, to ask about the status of his request.

A reasonable person would conclude from the fact that Dr. Colaneri's second form did not certify a need for medical leave that he or she was not protected by the FMLA.  As the Supreme Court has stated, to obtain estoppel a party's reliance "must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading."  Heckler, 467 U.S. at 59.  Put another way, a party's reliance must not have been negligent in order to be reasonable.  See id. at 59 n.10 ("If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." (quoting 3 J. Pomeroy, Equity Jurisprudence § 810, p. 219 (S. Symons ed. 1941))).  Reed could have easily sought clarification from Scott Patsaros, who worked at the Bridgeton plant and whose telephone number was provided in the FMLA information packet.  There is no evidence that he attempted to do so.  Instead, he chose to rely on a statement he overheard while listening outside a conference room door.  Reliance on Kato's remarks to Badolato, especially when Reed failed to contact Patsaros as he had been instructed to do, was unreasonable.

Furthermore, Reed has failed to cite any cases that support the reasonableness of his reliance on Kato's statement.  In Duty v. Norton-Alcoa Proppants, this Court held that the employer could be estopped from asserting that the employee had exhausted his 12 weeks of FMLA leave because the employer sent him an official letter clearly guaranteeing him 34 weeks of leave.  293 F.3d at 493-94.  Compared to the letter in Duty, Kato's conversation with Badolato is a thin reed on which to support an estoppel claim.  Similarly, in Kosakow v. New Rochelle Radiology Associates, P.C., the Second Circuit held that an employer could be estopped by its failure to notify an employee that she was not eligible for FMLA leave after she requested leave for an

-10-

upcoming surgery, even though the failure was unintentional. 274 F.3d 706, 725-26 (2d Cir. 2001). Unlike the employer in <u>Kosakow</u>, Lear twice informed Reed that his request was denied. Finally, in <u>Dillon v. Admiral Cruises, Inc.</u>, this Court held that a cruise line could be estopped from asserting a one-year limitation period printed on its ticket where the cruise line stipulated that it had agreed to discuss settlement after plaintiff completed her medical treatment, which it knew would last for more than a year. 960 F.2d 743, 745 (8th Cir. 1992). Lear makes no such stipulation here, and Reed's attempt to pin his case on Kato's remarks falters on the strength of Lear's communications to him that his request had been denied.

Moreover, in <u>Slentz v. City of Republic, Mo.</u>, 448 F.3d 1008 (8th Cir. 2006), this Court upheld a grant of summary judgment denying an employee's FMLA estoppel claim. Slentz argued that his employer should be estopped from asserting that he had used more than his 12 weeks of allotted FMLA leave because the employer granted Slentz leave beginning on January 30, 2003, when it knew he could not return to work until May 17, 2003. <u>Id.</u> at 1011. We rejected his claim because the letter in question specifically informed him that he was entitled to a maximum of 12 weeks of leave. <u>Id.</u> (also holding that employee could not show that he detrimentally relied when he had scheduled surgery before he received letter). Similarly, Lear's clear and repeated communications to Reed of his failure to submit the required medical certification entitle it to summary judgment as to whether Reed reasonably relied on Kato's remarks.

In sum, Lear informed Reed at least three times, in the FMLA information packet and in the two letters denying his request, that he needed to submit a medical certification form attesting to his inability to work. The second denial letter stated clearly that his request had been denied and that he was not on provisional leave. Reed could have easily asked Patsaros about the meaning of the second letter, but he did not. Instead, he seized upon a remark he overheard while waiting outside a conference room

and inquired no further about his request.  Estoppel is too exceptional a remedy for such an undistinguished claim.

## III.

Reed also challenges the district court's finding that his suit is time-barred by the FMLA's two-year statute of limitations.  See 29 U.S.C. § 2617(c)(1) ("an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought").[3]  Reed argues that there is a genuine issue of material fact as to whether the violation occurred on November 26, 2003, when Lear gave him the second denial letter, or on January 7, 2003, when Lear terminated his employment.  This contention rests on the same argument as Reed's estoppel claim, i.e. that the second letter was so unclear that Lear should be estopped from claiming that it denied his FMLA request before terminating his employment.

An FMLA violation occurs when an employer improperly denies a request for leave.  See Bush v. Special Sch. Dist. of St. Louis County, No. 4:08CV00170 ERW, 2008 WL 2397381, at *3 (E.D. Mo. June 9, 2008) (FMLA violation occurs when employee is denied leave to which employee was entitled); Fialho v. Girl Scouts of Milwaukee Area, Inc., No. 06-C-1218, 2007 WL 1246433, at *2 (E.D. Wis. Apr. 30, 2007) ("[t]he statute of limitations for an ordinary FMLA violation–where the plaintiff applied for leave, was entitled to leave, and had her request rejected–is two years") (quotation omitted).  Reed does not argue that he was entitled to FMLA leave, but that he reasonably believed that he was on provisional leave because of Kato's explanation of the second denial letter to Badolato.  As we demonstrated above, the second letter was sufficiently clear that as a matter of law no reasonable person could conclude from

_____

[3]29 U.S.C. § 2617(c)(2) provides a three-year period for claims alleging "willful violation."  There is no allegation of a willful violation here.

-12-

it that Reed was on provisional FMLA leave. Summary judgment was therefore proper as no genuine issue of material fact exists concerning whether the alleged violation occurred on November 26, 2003.

## IV.

Finally, Reed argues that Lear violated the Department of Labor's regulations implementing the FMLA when it refused to designate retroactively Reed's absences as vacation days. Pursuant to the FMLA, the Department of Labor's regulations provide that when an employee has submitted a completed certification form stating that he or she cannot work because of a disability, an employer may seek a second opinion. See 29 C.F.R. § 825.307(a)(2). In this situation, the employee is "provisionally entitled to the benefits of the Act." Id. However, "[i]f the certifications do not ultimately establish the employee's entitlement to FMLA leave, the leave . . . may treated as paid or unpaid leave under the employer's established leave policies." Id.

Reed never submitted a completed form stating that he could not work because of a qualifying health condition. Accordingly, Reed never made a provisional showing that he was eligible for leave under the FMLA, a showing that is a necessary predicate for the application of section 825.307(a)(2). See Rhoads v. F.D.I.C., 257 F.3d 373, 384 (4th Cir. 2001) (employees must show that they are afflicted with FMLA-qualifying condition before they can prevail on claim that employer interfered with any rights under the Act). Thus, Reed's claim that the FMLA obliged Lear to treat his December absences as vacation days has no merit.

## V.

Accordingly, the judgment below is affirmed.

_____